Next case is Tuna Processors v. Hawaii International Seafood 2008-14-10 Mr. Yamaoka invented a process that burns sawdust to produce smoke, filters the smoke, and then applies the smoke to fish, cooling the fish at the same time to preserve the fresh taste and appearance of the fish. My opponent, Hawaii International Seafood, a former licensee of Mr. Yamaoka, copied the process and in an effort to avoid infringement, obtained an erroneous claim construction. The proper claim construction should be as follows. 1. Burning the smoking material at 250-400 degrees Celsius applies to the temperature of the smoking material. 2. Filtering to remove mainly tar means that any filtering... Well, let's deal with that at 250 degrees. If you're conducting a normal chemical reaction at, say, 200 degrees, you put a thermometer in and you're measuring the temperature of a liquid in which the reaction is taking place at a uniform temperature, here you're burning wood. And I would gather it's rather difficult to determine the temperature of one piece of wood versus another piece of wood, and the court found that the language was ambiguous and looked to extrinsic evidence from people of skill in the art who said, you really can't do it. And that's why you use the temperature of the external apparatus that imposes the temperature. Your Honor, I believe the district court was in error for a couple of reasons there. First, going to extrinsic evidence in the first place. If you look at the plain language of the claims, the only thing the temperature can relate to is the smoking material. A chamber is unclaimed. It's an additional element that the court imported. I wouldn't say burning a smoking material which has the temperature of 250 degrees. You're right, Your Honor. It says at, which is ambiguous. Your Honor, I don't believe at is. At is not ambiguous at all, because the temperature has to relate to another element in the claim. What does it relate to? We are at the court. That's not ambiguous. But here we're talking about a particular environment where, as I say, you've got pieces of wood, right? Between the wood, is it 250 degrees, or is it one piece of wood versus another piece of wood? Well, Your Honor, this particular environment is a cylinder packed full of sawdust. And if you look at the specifications, they help answer the potential ambiguity. Again, I submit there's no ambiguity in the claims. The element is the smoking material. The element is the temperature. The two must relate together. And to get to your point about extrinsic evidence, the court incorrectly relied on extrinsic evidence, because this is not a person of ordinary skill in the art. If you're referring to the statements made by Mr. Richard Friend, he is, this was post-issuance, and this court has said many times that we look at the claims as construed by a person of ordinary skill in the art at the time of invention. So this is post-issuance statements. He is not an inventor. About Dr. Maga? Your Honor, I think Dr. Maga actually supports the fact that temperature relates to the smoking material. And I believe the specifications of the graphs and the actual column two of the patent itself in the written description really talk about what happens when the temperature of the burning material reaches these various points. If you look at the total graphs 2A and 2B, you're looking at the temperature of the material, not the temperature of the chamber. Well, I'm reading quotes from the district court's opinion. Dr. Maga states that members of the industry do not measure the actual temperature of the sawdust of wood. He believes the temperatures would be read by commercial producers as the temperature at which the unit is operated. Then Dr. Kumazawa, temperature, sawdust temperature is very difficult to measure. Similarly, Dr. Hagedorn, it seems to me there was a fair amount for her to rely on. Well, Your Honor, first off, I believe at best this requires remand for further factual findings to see what purple of ordinary skill in the art actually do. And again, this court has made clear you can't get to extrinsic evidence unless both the limitations and the language of the claims are ambiguous and the specification is ambiguous. Again, I submit the language of the claims is not ambiguous and the specification is certainly not ambiguous. Is there anything in this specification that describes or discloses how the temperature of the wood itself is measured? Yes, Your Honor. In the summary of invention, you talk about, give me just a second, yes, in the summary of invention, I will find the specific quote, but it talks about the wood is placed and when you look at the description, you look at the drawing on page, drawing figure one, you have the wood placed directly on a heater. That heater is thermostat controlled. That heater can be set to between 250 and 400 degrees. And what is it that determines the setting? It's the controller 51, all right? Correct, but the controller sets the heater, but the sawdust is... Medium and not the temperature of the material. No, Your Honor. It measures the temperature of the heater and the material is directly on the heater and the material is burning at what the heater is heated to. Because this is a chemical process, it has to occur at specific temperatures. 451 degrees Fahrenheit, we all know, is a burning temperature at which paper burns. This must occur at specific temperatures and the temperatures must relate to the burning material. And again, that's what the specifications teach. That's what the plain language of the claims is, that the temperature relates to the smoking material and therefore, extrinsic evidence is not necessary. But the disclosure talks about the controller fitted to the smoke generating chamber to detect and control the temperature therein and there's nothing in the spec that talks about anything that detects and controls the temperature of the wood. Well, Your Honor, I believe there's two things going on. One, there's the temperature probe that detects the temperature therein, but there is the thermostat that actually the sawdust lays on and the thermostat controls the heating element which controls the temperature at which the sawdust itself burns, not the temperature inside the chamber. Let me ask another question. As I read the stipulation, there are three claim construction items in question and the stipulation is premised on the fact that the accused structures don't meet any of those three. Your Honor, I believe that's an incorrect understanding of the stipulation. What the stipulation says is that under all of these three, there is no infringement. Any one, reversing any one of these requires remand for further factual findings of infringement. Well, it says here paragraph three of the stipulation, appendix, joint appendix three, says does not infringe because the patent claim limitations, patent claim limitations, plural, referred to in paragraph two are not met in regards to any of the products. So I read that to say that none of those limitations are present. We stipulated to a finding of non-infringement because under the claim construction of all three of these, nobody infringed. However, reversing any one of these will get us to a point where we need to do further factual findings to determine whether there is infringement or not. That's not what paragraph seven of the stipulation says. If the court reverses the disputed claim construction points, that doesn't say any of them. It means all three of them. Well, Your Honor, it also does not say reverses all three disputed claims. It just says reverses the disputed claim construction. The disputed claim construction points, period. I'm in plural. Plural. Comma. Again, if you read it in conjunction with three, we stipulate at best that is ambiguous. If you read it in conjunction with paragraph three, we stipulated that under all three claim constructions, there was a holding of non-infringement. Reversing any one goes to showing that there is remand for further factual indications. Now, let's look at the third contested claim limitation, the smoke cooled. Court essentially interpreted that as meaning the smoke having been cooled. And you dispute that. Yes, Your Honor. But you look at the previous one. It says cooling the smoke, and then smoking the tuna meat. So isn't it obvious that cooling the smoke comes before exposing it to tuna, exposing the tuna to the smoke? Your Honor, cooling the smoke can occur. But that can occur by taking the temperature at which the smoke is created, which is the current temperature of the smoking material, 250 to 400. Cooling it to room temperature, and then the ultimate cooling to zero to five occurs at the same time. And the claims are pretty clear that so long as the tuna is exposed to smoke cooled to zero to five, that this element in the claims is met. If you look at the specifications, written description column three, it talks about line 35 to 38. It specifically talks about, then the smoke exposed to the fish or meat to be cured becomes as cold as zero to five. So again, the smoke can be cooled while it's being exposed to the fish. And also, the specifications specifically talk about the fact that smoking is a long process. Even small bite-sized pieces take eight hours to smoke. And the steaks take up to 24 hours to smoke. So you cool them down, and then you cool them, and as long as the smoking occurs at zero to five over time. So as long as the smoke reaches zero to five, then the fish is exposed to that smoke, then the cooling occurs, and it doesn't require the smoke be completely cooled at the beginning to zero to five. Well, in the appendix at page 348, in the amendment that was filed, and the argument submitted against the office action, says about the middle of the page there, none of the references disclose or render obvious the advantageous results achieved by the combined features of the present invention, including exposing the tuna to cooled smoke. Yes, your honor. And what does- This again suggests that there is an order to the process where the smoke is first cooled and then the tuna is exposed to it. Your honor, I believe what that's referring to can be also found in column two of the patent. And what the inventor is talking about is that the smoke is cooled to zero to five. Nobody cooled smoke that cold before. And so as long as the smoke is cooled to that, the fresh taste and fresh appearance of the tuna is preserved. If you have hotter smoke, you could end up cooking the tuna, much like we have beef jerky and that sort of thing. And if it's too cold, then the smoke doesn't work. And so that's what the nature of this invention was, is the super cold smoking. And the smoking process, again, over time, will occur at that temperature. But the smoke is cooled first before the fish is exposed to it. The smoke is cooled partially first, yes, but it is not completely cooled to zero to five until exposure- Where do you get the partially cooled? Your honor, that's what people of ordinary skill in the art do. Where do you get it in the patent or the specification? Again, I point to column three, 35 to 38. How about reading the claim where it says cooling the smoke to between zero and five degrees? Yes, your honor. And if you look, though, the claim does not require an additional smoking unit in the smoking. So the cooling unit can also be the smoking unit. And so this cooling and smoking can occur at the same time, especially at zero to five. In column three, lines 42 to 44, it says if the smoke temperature is higher than the specified range, but the only specified range is the zero to five degrees C, the risk of damaging the freshness of fish or meat increases. I mean, doesn't that make it absolutely clear that the smoke is first cooled before the fish is exposed to it? No, your honor. It just says that the smoking must occur over this temperature as long as the smoking is cooled right away and it doesn't rise back up. If it starts at zero to five and rises back up, then yes, the fresh taste of the fish will be damaged. But as long as it stays at that temperature, you're fine. Well, just to be clear, there's no smoking in the court. But we'll save the two minutes for you. Thank you, your honor. And we'll hear from Mr. Yasunaga. Mr. Yasunaga, before you begin, I need to tell you that we think your cross appeal was an improper cross appeal because it states another reason for the judgment of non-infringement, so your fourth brief was not effective. And I'm telling you now so that you will not save time for your second appearance because you only have one as an appellee. And I should also point out that if your fourth brief had been proper as a cross appeal, it had a couple of pages addressing the main appeal. And if a cross appellant has a proper argument, second argument in his cross appeal, he cannot address the main appeal. Sort of like getting in a counter punch after the bell. The- Sorry, your honor. Appellant has the last word on the main appeal. So you've got 15 minutes. All right. May it please the court. On the stipulation says that there was no infringement because of three limitations. And in order to have infringement, you've got to, all of the limitations have to apply. And so my opponent is incorrect to say that if the court reverses the construction of even one limitation, then we have to go back down. But that's an argument that you're making. Just like he made an argument. But how do we derive that from the language of the stipulation? I've explained it in my brief. First of all, the stipulation says that the parties stipulate that all three of those limitations do not apply. And therefore, even if you reverse the construction of one, that would mean the stipulation remains that the other two don't apply. And because one or two limitations don't apply, case is over. There's no infringement. Well, actually, I don't find the word all in the stipulation. But you're saying the use of the plural language, in effect, means all. Well, as I said in- Yeah, well, for example, why would all three limitations even be discussed in the stipulation if they were not all three material? The reason they're there is because every one doesn't apply. Otherwise, there's no point in discussing. There was a construction of whether the word tuna applied only to the species of tuna. That's not in the stipulation, because they never contested that that one, or we never contested that that one was infringed, at least for tuna. Tell us about the temperature. OK, as far as the temperature, the construction put out by TPI is one would make that limitation a nullity. They talked about this passing through argument. Well, as long as the sawdust passes through 250 to 400, even if you've got a reactor heating at 1,000 degrees centigrade, then you're within their patent. That interpretation would mean that the 250 to 400 really becomes a nullity. But if something's done at 250, doesn't it imply that it is at 250? No, because when the reactor is, say, at 1,000 degrees, and they don't put the sawdust through until it's already at 1,000 degrees, that sawdust might pass through. What's at 1,000 degrees? The oven. The oven is set. Does that mean the temperature in the center of the oven is 1,000 degrees? Before the sawdust goes in. With an oven, you're measuring the space inside the oven. Now, this is sawdust that is sent through there to turn into smoke. If it is the sawdust, what temperature is being measured? The top of the sawdust, the glowing edge, the middle where the heat hasn't quite gone into, and that's why all those experts and people in the industry, including the appellant's own people, said they don't measure the sawdust temperature. They don't know what it is. I was stricken by their own expert who said, well, maybe to measure it, we do something like the Martian Lander. I mean, talk about experimentation. The industry just sets the oven at a certain temperature. The example given in the patent that talks about set it at 360 degrees. You can't have a temperature like that when you're talking about burning smoke because it changes, things happen at different times. Wood is made up of many, many different things. And so the fact that they pick one temperature shows it's an oven setting. And the fact that it's a multiple of 10, a nice even number, as mentioned in the Eastman case, also indicates that. To make smoke, you want to restrict oxygen. So it's not a self-sustaining reaction. It's not like you light a match, toss it in a pile of leaves, and then it burns. You've got to set the oven temperature and keep that oven temperature applying heat. And there's language in the patent that makes it very clear because it talks about, Appendix 368, apply heat at 360 to 400 degrees. Where is that in the patent? I'm sorry, it's not in the patent. It is, this is one of the examples of how the people who were trying to enforce the patent were going around describing what the patent says. And they said, you apply heat at 360 to 400. That's sort of doubly extrinsic, isn't it? We really look to the patent and then the question is, when do we go outside the patent? You're right, but this is just confirming that the language of the patent is such. The Eastman case said, when you're talking about at, that's a process limitation. That's what you set the apparatus at. If you'd use the word to, like in the Chef America case, then you'd be talking about the temperature of the material being heated. The argument about, gee, there's no- It's not that simple, though. Words at and to don't necessarily mean what you're suggesting. It depends, does it not, on the context in which it is used and the rest of the specification. That is true, and the specification certainly, I think, as brought up by your earlier question, certainly supports that at is talking about the temperature setting. Mr. Elliott talked about- I mean, my point is that Eastman Codec doesn't set a definitive rule of law as to the meaning of at and to in patent. That is true. In that case, it went all the way to the extrinsic evidence. And where you stop along there, I don't know. In our case, I think the language is clear. If you have to go to the specifications, the specifications are clear. And then if you go to the extrinsic evidence, that makes it more clear. I would disagree with the district court in that I don't think you need to reach the extrinsic evidence. I think you can take it just from the language of the claims or certainly from the language of the specifications that make it clear it's the temperature that you set the heating mechanism at. What is the strongest point in the specification in support of that, that we don't need extrinsic, that it's the temperature of the apparatus? One says adjust the temperature of the heater. Another says the heater sets the temperature necessary. I don't know how to... I'm sorry. Where is that in the patent? Column two, line 56. No, column four, line 30 to 32 on appendix page 44. The heater sets the temperature necessary for the production of smoke having the desired composition. But that could mean if you want the reaction to occur at 250, you set the heater at 300. I mean, this doesn't say the heater sets the temperature at 250, does it? Well, but then how is someone supposed to know what you set the heater at if you're not talking about the heater temperature? How does someone know that to get the sawdust... Well, that's a failure of the enablement, isn't it? That may be true, but I think it's pretty clear. The use of the words adjusting sets control our apparatus type words, and those are all talking about setting the heater temperature. That discussion is in the context of an embodiment. It does not necessarily go extensive with the full scope of the invention. Actually, I think there are general statements where these come from. For example, the description of the preferred embodiment starts at A44. You're right, these are talking about A44, A45. The trial court needed the extrinsic evidence, didn't it? Well, I think it felt very comfortable with the extrinsic evidence or it certainly made things very clear for the trial court. And I think in being cautious, it wanted to point that out. Because if nobody in the industry knows how to measure the sawdust and what part of the sawdust are you measuring, how could anybody with reasonable skill in the art interpret this claim as referring to the temperature of the sawdust? The filtering step of passing the smoke through a filter to remove mainly tar therefrom. The things that give smoke taste include some things that are particles, but also things that are not particles. The phenols in the smoke, some of them are particles, but some of them are in the form of gaseous vapor. And the Yamaoka patent teaches filtering. The only kind of filter they ever describe is a mesh filter. And they say to filter out the relatively larger particles, which will be mainly tar. So that word mainly tar, as I mentioned, it's kind of confusing. It means something else though, doesn't it? There may be some other things besides tar that get filtered out, but they would be relatively larger particles. And the patent never describes them, never says to watch out for them and try to filter them out. I would think that they would be things such as fly ash. When you burn paper, there's black stuff that fills up over there. But your point is that the specification talks about leaving flavor. Right, they always talk about leaving, in fact, they say impart flavor. The patent teaches against not leaving flavor because it talks about, on column seven, the level of aromatic smell characteristic of smoked products can be easily raised by varying the kind of the filtering materials. But the only filters they talk about are mesh filters, if you look at column three, lines 18 to 20. The patent clearly wanted to give a smoke flavor is also shown by the fact that the patent in the preferred mode, column five, line 57, 58, says the slices of fish were immersed in water with smoke liquid. Now liquid smoke is used to give smoke flavor to foods. This is a pre-smoking step. You put it in water with smoke liquid, and then you smoke it with this smoke that is meant to impart what they call an agreeable flavor, not too harsh. Nobody wants ham or fish with gunks of tar on it or ashes on it. So some filtering is conventional in smoking of foods. The patent office noted that in the file history, and that's absolutely true. Some filtering is conventional, and filtering out tar is conventional. You probably call this your tasteful argument. The Schick patent, which was cited, also indicates it's a patent that says you remove all the particles, all the tar, gunk, and you get a smoke that gives the food a very outstanding smoke taste. None of the aromatic ingredients are removed. Oh, again, a mesh filter will only remove particles. And then the patent says relatively larger particles. Now relatively is a very unclear word, and that may be another problem. We have a little time left. What about the other limitation, the smoke cool? The claim talks about an earlier step where you cool the smoke that was produced in a separate cooling unit. And then it talks about you then take, then you treat the fish by exposing it to the smoke, the cooled smoke. The ED in cooled means it had to have happened before. And the word the also means it's talking about something before. And what was the smoke before was what was cooled. In TPI's brief, they tried to contrast the word the and the word said. And I pointed out the Landis on mechanics of claim drafting that said the and said, use the same function. If you really want something new, you use the word a. And the combined systems case was the one where they had the words formed, folds. And so they said, because it said formed folds, the forming had to be done as an earlier step. And the EPAS case was transferred data. And this court said that the ED and transferred said the data had to be transferred before the other step. I would like to just mention on the cross appeal and not to argue it, but the intention was not to undo the summary judgment because we already got the result we wanted, but having law out there, TPI has gone around sending notices of infringement to many other people, including our licensees, people we would like to license. And so we're not too happy having that disclosure dedication opinion out there, but I certainly take the court's position. And so, well, I, I, I should add, there's nothing wrong with arguing that point. One just doesn't get a second argument and one doesn't get a fourth brief. But nothing wrong with arguing it. And you did, and we understand. All right. Thank you. Thank you, Mr. Yasunaga. This is very cool, Your Honor. But first I would like to talk about filtering since I didn't get a chance beforehand. Again, the claim language does not have the element of taste in it. It says remove mainly tar. Any process, any method that removes in addition to tar is covered by this patent. And secondly, even if that is confusing language and you go to the specifications and you talk about an agreeable taste, JA 95 clearly says that this is for the raw sushi and sashimi markets, and an agreeable taste in those markets is a taste that is a fresh taste. And the only imparting of a taste that occurs in this patent is normally when you freeze at normal temperatures and then thaw, you get a different taste. This imparts a fresh taste at the end of that thawing temperature. I would briefly like to go back to your arguments about burning. I agree with you. The extrinsic evidence is improper. We don't make arguments. Sorry. Your questions. I apologize. We run to ask questions. I would like to address both Eastman Kodak and Chef America. Judge Lynn pointed out and questioned that isn't it context? And it is absolutely context. And in the context of this case, the element of the temperature relates to the element of the burning material. There is no other element of a medium. And Mr. Yasunaga pointed out that 360 should mean the temperature of the chamber. Yet we know that 451 degrees Fahrenheit is a specific temperature too. And that is the specific temperature at which paper burns. 360 can be a specific temperature. I submit that further factual findings will be needed to find out how people can measure this. I believe all the experts are wrong. I believe it would be very easy to measure the temperature of the smoking material. You may not do it on this, but you can create graphs and create knowledge and say, OK, I know what I need to burn at. Do you think fact-finding is necessary for claim construction? Your Honor, I think fact-finding is necessary for infringement. I believe the claim construction is incorrect. And so further fact-finding will be helpful to determine whether or not there is infringement. And I am out of time. Thank you. Thank you, Mr. Elliott. We'll take the case under advisory.